❏ Original          ❏ Duplicate Original

# UNITED STATES DISTRICT COURT

for the

Eastern District of Wisconsin

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br>T.B. and devices found on T.B.'s person | )<br>)<br>)<br>)<br>)<br>)    Case No. 25-926M(NJ) |

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:     Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the _____ Eastern _____ District of _____ Wisconsin _____
*(identify the person or describe the property to be searched and give its location)*:

see Attachment A.

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

see Attachment B.

**YOU ARE COMMANDED** to execute this warrant on or before _____ 6/6/2025 _____ *(not to exceed 14 days)*

☑ in the daytime 6:00 a.m. to 10:00 p.m.     ❏ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to _____ Honorable Nancy Joseph _____ .
*(United States Magistrate Judge)*

❏ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*

❏ for _____ days *(not to exceed 30)*   ❏ until, the facts justifying, the later specific date of _____ .

Date and time issued:     5/23/2025 @ 1:28 p.m.          *[signature]*
                                                                            *Judge's signature*

City and state:     Milwaukee, WI                Honorable Nancy Joseph, U.S. Magistrate Judge
                                                                    *Printed name and title*

## Return

| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |
|---|---|---|

Inventory made in the presence of :

Inventory of the property taken and name(s) of any person(s) seized:

## Certification

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

## ATTACHMENT A

## To Be Searched

A. The person of Takia A. BURRIS ("BURRIS"), DOB 12/4/1989; and,

B. Any electronic devices found on BURRIS's person, including but not limited to the cellular device assigned call number 414-324-9850 ("the TARGET DEVICES").

## ATTACHMENT B

1.      All records from the TARGET DEVICES as described in Attachment A that relate to violations of 21 U.S.C. § 846 (conspiracy to distribute, and possess with the intent to distribute, controlled substances); 21 U.S.C. § 843(b) (use of a telephone to facilitate drug trafficking); 21 U.S.C. § 841 (possession of controlled substances with intent to distribute); and 18 U.S.C. § 922(o) (possession of a machine gun) (collectively, "the TARGET OFFENSES"), including but not limited to the following:

     a.  Any communications regarding controlled substances or firearms;

     b.  Location information of BURRIS and any co-conspirators and any information regarding BURRIS' schedule, pattern of movement or travel;

     c.  Any payment information including bank transfers, Cashapp transfers, text messages, social media messages, audio/video messages or photographs of bank records, or other financial records;

     d.  Any images, including videos, of illegal narcotics or firearms;

     e.  Records of Internet Protocol addresses used; records of Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user typed web addresses.

     f.  Evidence of user attribution showing who used or owned the TARGET DEVICES at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history.

During the execution of the searches described in Attachment A, law enforcement personnel are authorized (1) to press the fingers (including thumbs) of  BURRIS (2) to present the face of BURRIS to the facial recognition sensor, such as a camera, ("Face ID"),

for the purpose of attempting to unlock the TARGET DEVICES in order to search the contents as authorized by this warrant.

This warrant authorizes a review of electronic storage media and electronically stored information seized or copied pursuant to this warrant, in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the FBI may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

# UNITED STATES DISTRICT COURT

for the

Eastern District of Wisconsin

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>**T.B. and devices found on T.B.'s person** | )<br>)<br>)<br>)<br>)     Case No.   25-926M(NJ)<br>)<br>) |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

see Attachment A

located in the _____Eastern_____ District of _____Wisconsin_____ , there is now concealed *(identify the person or describe the property to be seized)*:

see Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☑ evidence of a crime;
- ☑ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. §§ 841, 843, 846;<br>18 U.S.C. § 922(o) | conspiracy to distribute, and possess with the intent to distribute, controlled<br>substances; use of a telephone to facilitate drug trafficking; PWID;<br>possession of a machine gun |

The application is based on these facts:

see attached Affidavit

- ☑ Continued on the attached sheet.
- ☐ Delayed notice of \_\_\_\_\_ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

FBI SA Christopher Burke
_____
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
_____telephone_____ *(specify reliable electronic means)*.

Date: \_\_\_5/23/2025\_\_\_

_____
*Judge's signature*

City and state: Milwaukee, WI

Honorable Nancy Joseph, U.S. Magistrate Judge
_____
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

I, Christopher J. Burke, being first duly sworn, hereby depose and state as follows:

## I.     BACKGROUND

1.     I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the search of the person of Takia A. BURRIS ("BURRIS"), DOB 12/4/1989, and any electronic devices found on BURRIS's person, including but not limited to the cellular device assigned call number 414-324-9850 ("the TARGET DEVICES"), as described in Attachment A. I further request that the contemplated search warrant authorize the search of the TARGET DEVICES for evidence more fully described in Attachment B.

2.     I am a Special Agent of the Federal Bureau of Investigation ("FBI") and have been since December 6, 2009. I am currently assigned to the FBI Milwaukee Field Office. As such, I am an investigative or law enforcement agent of the United States authorized under Title 18, United States Code, Section 3052, that is, an officer of the United States who is empowered by law to conduct investigations, to make arrests, and to collect evidence for various violations of federal law.

3.     I am currently assigned to an FBI squad which investigates public corruption crimes. During my tenure with the FBI, I have participated in investigations involving the corruption of public officials, to include law enforcement officers. I have participated in all aspects of investigations including executing search warrants involving, among other things, the search and seizure of cellphones, computers,

computer equipment, software, and electronically stored information. Through my experience and training, I have become familiar with activities of individuals engaged in illegal activities, to include their techniques, methods, language, and terms. During my career, my investigations have included the use of various surveillance techniques and the execution of numerous search and seizure warrants, including for computers and cellular telephones.

4.     I have been trained in a variety of investigative and legal matters, including the topics of Fourth Amendment searches, the drafting of search warrant affidavits, and probable cause.  I have participated in criminal investigations, surveillance, search warrants, interviews, and debriefs of arrested subjects.  As a result of this training and investigative experience, I have learned how and why violent actors typically conduct various aspects of their criminal activities.

5.     This affidavit is based upon my personal knowledge and upon information reported to me by other federal and local law enforcement officers during the course of their official duties, all of whom I believe to be truthful and reliable.  Throughout this affidavit, reference will be made to case Agents.  Case Agents are those federal, state, and local law enforcement officers who have directly participated in this investigation, and with whom your affiant has had regular contact regarding this investigation.  The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents, witnesses, and agencies.

6.     This Affidavit is intended to show merely that there is sufficient probable cause for the requested warrant. It does not set forth all of my knowledge, or the

knowledge of others, about this matter. Quotations in this affidavit are not precise, and selections are provided for context.

7. Based on my training and experience and the facts as set forth in this Affidavit, I submit that there is probable cause to believe that BURRIS and her associates have committed violations of 21 U.S.C. § 846 (conspiracy to distribute, and possess with the intent to distribute, controlled substances); 21 U.S.C. § 843(b) (use of a telephone to facilitate drug trafficking); 21 U.S.C. § 841 (possession of controlled substances with intent to distribute); and 18 U.S.C. § 922(o) (possession of a machine gun) (collectively, "the TARGET OFFENSES"). As a result, there is probable cause to search BURRIS' person, further described in Attachment A, for the TARGET DEVICES, and to further search the TARGET DEVICES for evidence of the TARGET OFFENSES.

## II.    PROBABLE CAUSE

8. The Federal Bureau of Investigation and its law enforcement partners are conducting a criminal investigation of Juwon Jacquez MADLOCK ("MADLOCK"). Thus far, that investigation has yielded evidence indicating that MADLOCK has unlawfully possessed a machine gun, lied to federal agents, provided felons with ammunition, possessed and concealed stolen property, and possessed controlled substances. *See United States v. Madlock*, 25-cr-00055, Dkt. 1 (E.D. Wis. March 25, 2025) (publicly available complaint against MADLOCK, incorporated here by reference).

9. As part of the investigation of MADLOCK, and pursuant to a federal search warrant, agents seized MADLOCK's electronic devices, which included MADLOCK's iPhone 16 Pro Max, assigned telephone number (414) 510-8500. During their review of

that device, agents found text messages between MADLOCK and BURRIS, using the cellular telephone assigned (414) 324-9850, which was saved in MADLOCK's contacts as "TAB." Agents suspect "TAB" was BURESS because: (i) in many of the text message communications between MADLOCK and "TAB," MADLOCK often refers to his interlocutor as "Takia"; and (ii) agents performed a cellphone provider search for cellphone number (414) 324-9850, and in response, T-Mobile USA indicated the (414) 324-9850 number was registered to BURRIS.

10.     From 1/4/2023 to 3/12/2025, MADLOCK and BURRIS exchanged over 61,000 text messages. Certain text messages, which are described in more detail below, reflect criminal misconduct by BURRIS and MADLOCK. Additionally, the text messages between MADLOCK and BURRIS suggest that MADLOCK and BURRIS were in a long-term sexual relationship. One example of this is that BURRIS regularly refers to MADLOCK as "My love."

11.     During the review of MADLOCK's iPhone, the case Agents discovered several text messages between MADDLOCK and BURRIS, in which MADLOCK and BURRIS engage in discussions regarding the buying and selling of illegal narcotics.

12.     On or about 1/11/2023, BURRIS and MADLOCK had the following text message conversation:

> TAB: Hey! How much can you sell a bottle of purple for?
> JUWON: A wholeeeee lotttttt lol
> JUWON: Why you ask that?
> TAB: $150 a line
> TAB: No because my mama got a bottle but she don't want my brother to sell it
> TAB: I think he usually sell it for $2200-2400
> JUWON: Yea that sound about right

JUWON: Take a pic
TAB: (sends picture of cough syrup with label scratched off)
TAB: (sends picture of cough syrup with label scratched off)
JUWON: Take a pic with a little in the top
TAB: (sends a picture of the top of the bottle/bottle cap)
TAB: The bottle sealed
JUWON: Okay and you sure it's purple?
TAB: I'm positive
TAB: That's all he get
JUWON: I'm bouta send it to my people see if they want it
JUWON: Okay
TAB: Ok
JUWON: I just called him he said let him get the whole bottle
JUWON: He coming from Dallas rn
TAB: For $2400
JUWON: Said he'll be here tonight
JUWON: I told him 150 a line
TAB: Yes
JUWON: Do you know if it's tris or Wockhardt or Quagen
TAB: It's promethazine
JUWON: Lmao I know that
JUWON: But those are the companies/brands
JUWON: They go for all different prices
TAB: Idk
TAB: And neither does she
JUWON: How soon she need it sold?
TAB: The man who she got it from be wanting his portion the next day
JUWON: What's his portion
TAB: Idk I think just a few hundred
TAB: It is the W
JUWON: Wockhardt?
JUWON: How do you know lol
TAB: She asked my brother
TAB: She said she probably gone get a bottle tomorrow and asked what kind
JUWON: How many lines
JUWON: Is it
TAB: 16
JUWON: A pint
JUWON: My boy wanna buy it for 24
JUWON: (Sends screenshot of his phone conversation with "his boy")
JUWON: You got the bottle?
TAB: Yes
TAB: Is the person getting g the bottle

JUWON: Yeah they want it bring it home
JUWON: I'll bring you the cash or Apple pay you when I get off
JUWON: Whenever she get the next bottle let me know

13.     This is the first text message chain, observed by law enforcement, where BURRIS and MADLOCK discuss selling illegal narcotics. In this text message chain, BURRIS and MADLOCK discuss selling purple cough syrup, which they describe as promethazine. Based on my experience and conversations with other law enforcement officers, I know that cough syrup with promethazine is prescribed by a doctor to alleviate symptoms associated with allergies, the common cold, and motion sickness; however, the cough syrup can be sold illegally to make purple drank (or lean), which is a drink that is used as a recreational drug.  This narcotic drink mixture is highly addictive and has contributed to overdose deaths.  Cough syrup with promethazine is sold illegally to make purple drank (or lean), and bottles can be sold from $2,000 to $4,000, and in some cases even higher depending on the brand. Promethazine is a Schedule V Controlled Substance, and the unlawful selling of a Schedule V drug in Wisconsin is a Class I felony. As BURRIS and MADLOCK continued to text message each other, they begin to escalate the type of drugs that they discuss selling, and they go from selling promethazine, to marijuana, to cocaine, as reflected in the text messages below.

14.     On or about 2/19/2023, BURRIS and MADLOCK had the following text message conversation:

JUWON: How much profit do you make per pound of weed
TAB: I can find out?
JUWON: Ok
TAB: That's what you're on today? (emoji)

JUWON: For og and exotic
TAB: Liked: "For og and exotic"
JUWON: Lmaoo I might get a couple pounds for when I'm suspended
JUWON: 😊😊😊
TAB: Oh and I know plenty weed heads like plenty as long as it's good

15.     In this text message communication, MADLOCK, who was a Milwaukee Police Department police officer at the time, asked BURRIS how much profit he can make from selling a pound of weed, which is a controlled substance. BURRIS tells MADLOCK that she could find out how much profit they could make. BURRIS also tells MADLOCK that she knows plenty of people who would buy the weed.

16.     On or about 3/11/2023, BURRIS and MADLOCK had the following text conversation:

JUWON: They just got over 100 pounds of weed from a storage unit
TAB: What are they about yo do with it
TAB: Did they get  the person
JUWON: Not yet
JUWON: They know who it is now tho
TAB: Oh
TAB: It's over then
TAB: How many officers found it
TAB: And how did they transport it back to the district
JUWON: (Picture of weed seizure)
JUWON: (Picture of weed seizure)
JUWON: He didn't pay his storage fees
JUWON: So they were about to auction it off
JUWON: Just checked and saw that
TAB: Damn that's crazy
TAB: He should've gotten all his stuff out
JUWON: Some weed
JUWON Seeing if I can make some quick money off of it Lmaoo
TAB: How you gone get it?
TAB: And yes ik a lot of people that would buy some from you
JUWON: How much people be charging a gram
JUWON: (sends three screenshots from Telegram of: GassboyzLA Menu, which

has pictures of weed and prices for different types and quantities of weed)
JUWON: 448/3.5 = 128x40=5120-1400 = 3720 profit
TAB: 3.5 for $30-$50/$75 depending on the quantity of weed like dispensary.
Seventh $50 or $150 it just depends on the quality. I just called my cousin
TAB: He said pounds $2000 or $2400 but if it's good weed it could be $5000
TAB: Zips cost $150 starting
JUWON: 5gs for a pound??
JUWON: If that's the case where's the profit?
TAB: He said that's old school prices
TAB: Now it's just the $2000 to $2400
TAB: Are you down town? If not call me right quick
JUWON (sends a screenshot from Telegram of: OG Rascal Supply, which has pictures of weed and prices for different types and quantities of weed, starting at $1,300 a pound)
JUWON: Just called you
JUWON 1700 a pound

17.     In this text message chain, MADLOCK tells BURRIS that the Milwaukee

Police Department just made a large seizure of weed from a storage unit. MADLOCK

then begins to ask BURRIS how much he could sell weed for by the gram. BURRIS tells

MADLOCK that she knows a lot of people who would buy weed from MADLOCK.

BURRIS also tells MADLOCK that she called her cousin to find out what weed was

currently selling for. MADLOCK then sends BURRIS pictures and prices of weed that

he found on a phone App called Telegram. MADOCK and BURRIS then discuss how

they could make selling weed profitable.

18.     On or about 5/3/2024, BURRIS and MADLOCK had the following text
conversation:

JUWON: (Sends an Amazon.com screenshot of a listing for Benzocaine Powder-High Purity)
TAB: What is that good for
TAB: Questioned "Amazon.com screenshot of Benzocaine Powder-High Purity"
JUWON: Cutting agent
TAB: I love you (heart emoji)
JUWON: For the stuff

JUWON: I love you more
TAB: (Sends a screenshot of an Ebay listing for Superior Lactose $28.99)
TAB: this one
JUWON: Yeah I know what you saying I'm saying that's one too
TAB: Oh ok

19.    On or about 5/8/2023, BURRIS and MADLOCK had the following text

conversation:

JUWON: Call man man and ask how much he would pay for an oz
TAB: 4147366605
TAB: I should be home by 4
TAB: I don't really be talking to him he annoying
JUWON: Lmao
JUWON: Ok ask Tata real quick
JUWON: Then
JUWON: I don't feel like it because they gone ask me 1 million questions
TAB: Lol ok
JUWON: So just say top dollar what would you pay
TAB: Manman said he been $500 but top dollar is $600/$650
JUWON: You just asked that
JUWON: ?
TAB: Yes
TAB: He answered on the first ring
JUWON: Okay. So I do it top dollar I would walk out with an extra 800. Without cutting it
TAB: Is that good?
JUWON: That's not worth it. So if I cut it and can add a lot on then yes it's great
JUWON: I'm gone buy some more add a lil of the other stuff let Tata do his thing see if it sdtick if it does then we in business
Tab: Loved "I'm gone buy some more add a lil of the other stuff let Tata do his thing see if it sdtick if it does then we in business"
TAB: You're buying a small amount?
JUWON: A quarter (emoji for a key)
TAB: Oh ok
JUWON: Put a 1 on every 1 turn it to a half thang
TAB: How much?
JUWON: Wyd
JUWON: Wyd
TAB: How much you paying for it?
TAB: I'm about to get under the dryer
JUWON: 5k
TAB: Oh ok

JUWON: If everything done right I can make 10-12k
TAB: Loved "If everything done right I can make 10-12k"
JUWON: If we do it right
TAB: that's double
JUWON: Yea
TAB: I'm here for it
JUWON: Unless you get that equity line of credit
JUWON: Then we can go really crazy

20.     In the text message conversations between MADLOCK and BURRIS in paragraphs 18 and 19, it is believed that BURRIS and MADLOCK are discussing selling cocaine, as cocaine is usually sold in kilograms or "kilos" and often "cut." MADLOCK tells BURRIS that he is going to buy a quarter kilogram for $5,000. They are then going to use a cutting agent to double the amount that they can sell. In my law enforcement experience, and based on conversations with other law enforcement officers, I know that by combining cocaine with other substances, sellers can increase the amount of their product without using more pure cocaine, which enables them to make more sales and earn higher profits. This method of using a cutting agent is commonly used with cocaine. In the text message conversation in paragraph 18, MADLOCK and BURRIS specifically discuss using Benzocaine Powder or Superior Lactose as a cutting agent. Then in paragraph 19, MADLOCK tells BURRIS that if they cut it and "we do it right," they can make $10,000 to $12,000 on their $5,000 investment. BURRIS replies by telling MADLOCK that they would double their money and BURRIS said: "I'm here for it," meaning that BURRIS thinks that they should do it. Additionally, MADLOCK said that if BURRIS could get more money, through an "equity line of credit," they could buy and sell larger quantities of cocaine.

21.     On or about 3/13/2024, BURRIS and MADLOCK had the following text

conversation:

JUWON: Call man man and ask how much he would pay for an oz
TAB: 4147366605
JUWON: Tell Tata 48 a quarter
TAB: I was waiting on Tata to respond I think he sleep so send the games
TAB: Did you talk to Tata
JUWON: Nope I did t
JUWON: How much the paying for the zips?
TAB: He think you selling an ounce for $450
JUWON: Who? Tata?
TAB: Yes.
TAB: I think that's he told the person that keep calling
JUWON: Tell em it's sold. And I gotta reup
JUWON: Because ain't no way.
TAB: I told them you didn't have anything
TAB: Emphasized "Because ain't no way"
JUWON: even if I had a whole key
JUWON: (image unreadable)
JUWON: I wouldn't make shit. Like that's dumb
TAB: How much they go for?
TAB: Exactly
JUWON: A key 15-20
JUWON: Still where would I make any money???
TAB: You wouldn't
JUWON: It's starting to make sense
JUWON: What I'm getting is Pyrex
JUWON: Pure*
JUWON: Gotta hit it then move it
JUWON: (image unreadable)
JUWON: You read it
TAB: Yes
JUWON: (unreadable image)
TAB: So first you hit it all then sell it
JUWON: Yes
JUWON: You read that part yet
TAB: Yes I did
JUWON: So if we gone do it we gotta buy the stuff
TAB: Yes

22.     In this text message conversation between MADLOCK and BURRIS, it is believed that BURRIS and MADLOCK are discussing the prospect of buying, cutting, and reselling cocaine, given their references to a "key" (kilogram), and having "pure" supply. MADLOCK also stated in the text message: "Tell em it's sold. And I gotta reup." This text message infers that MADLOCK has already sold off his supply of cocaine and that he needs to "reup." Re-up is a commonly used slang term for the illegal drug trade, which denotes the act of replenishing an exhausted drug supply, and it typically involves acquiring a new supply of illegal drugs.

23.     On or about 1/15/2025, MADLOCK had the following text conversation, with a number ending in x2463:

X2463: ain't you a weed man now? Cause I need some [emoji]
JUWON: Lmaooo that's policeeeeee
X2463: lmfao see you should've never said that shit
JUWON: What you need
X2463: what you got tf

24.     In this conversation, MADLOCK is identified as a marijuana seller ("weed man") by his interlocutor, and when prompted, he offers to sell them what they "need" (i.e., marijuana).

25.     On 3/12/2025, agents executed a federal search warrant of MADLOCK's residence. During the execution of this search warrant, agents found a bag of marijuana that was located inside of a shoe box inside of MADLOCK's residence. The bag of marijuana weighed approximately 187.7 grams (or 6.62 oz). I believe this marijuana was for distribution, for a few reasons. First, the text messages above indicated MADLOCK was dealing marijuana. What's more, I understand that MADLOCK, as a police officer,

was routinely tested for marijuana use, and based on his continued employment, I believe those tests were negative. Additionally, when MADLOCK was interviewed by the agents, MADLOCK stated that he did not smoke weed (marijuana), and MADLOCK even offered to take a drug test to prove it.

26. Inside MADLOCK's home, agents also found a handgun equipped with a conversion device, which rendered the weapon a machinegun under federal law. MADLOCK and BURRIS similarly discussed the sale of conversion devices.

27. On or about 2/6/2024, BURRIS and MADLOCK had the following text Conversation, believed to be regarding the purchase of conversion devices:

TAB: (sends pic of conversion devices)
TAB: (sends another pic of a conversion device in a baggie)
MADLOCK: Oweeeee get one
MADLOCK: That's the dude
MADLOCK: Buy it I got the cash
TAB: Which one?
MADLOCK: A green one
JUWON: Make sure it's the full thing
MADLOCK: (sends picture of a conversion device, labeled Glock Switch)
TAB: "Questioned an image"
MADLOCK: Should look like this
TAB: Ok
TAB: He has the Glock one
TAB: Right now but he just order more which are the colorful one and they should be here tomorrow
MADLOCK: Huh?
TAB: He has one Glock switch right now the rest will be here tomorrow
MADLOCK: Get the one he has

### The Target Device and Other Devices

28. In my training and experience, people frequently keep their cellular

telephone on or very near their person at nearly all times of the day. I believe BURRIS follows this pattern, as shown by the amount of text messages that she has each day with MADLOCK.

29.     Based on my training and experience, I use the following technical terms to convey the following meanings:

  a)   Wireless telephone: A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

  b)  Digital camera: A digital camera is a camera that records pictures as

digital picture files, rather than by using photographic film. Digital

cameras use a variety of fixed and removable storage media to store their

recorded images. Images can usually be retrieved by connecting the

camera to a computer or by connecting the removable storage medium to

a separate reader. Removable storage media include various types of flash

memory cards or miniature hard drives. Most digital cameras also include

a screen for viewing the stored images. This storage media can contain

any digital data, including data unrelated to photographs or videos.

c) Portable media player: A portable media player (or "MP3 Player" or iPod)

is a handheld digital storage device designed primarily to store and play

audio, video, or photographic files. However, a portable media player can

also store other digital data. Some portable media players can use

removable storage media. Removable storage media include various types

of flash memory cards or miniature hard drives. This removable storage

media can also store any digital data. Depending on the model, a portable

media player may have the ability to store very large amounts of

electronic data and may offer additional features such as a calendar,

contact list, clock, or games.

d) GPS: A GPS navigation device uses the Global Positioning System to

display its current location. It often contains records the locations where it

has been. Some GPS navigation devices can give a user driving or walking

directions to another location. These devices can contain records of the

addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e) PDA: A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs. Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail. PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word-processing documents, spreadsheets, and presentations. PDAs may also include global positioning system ("GPS")

technology for determining the location of the device. 40. Based on my training, experience, and research, and from consulting the manufacturer's advertisements and product technical specifications available online, I know that the Target Device has capabilities that allow it to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, and PDA. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

30.　 Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

31.　 As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the devices associated with BURRIS were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence might be on the devices described here because:

　　　　　a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from

a word processing file).

b.  Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c.  A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d.  The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.  Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

32.  Nature of examination: Based on the foregoing, and consistent with Rule

41(e)(2)(B), the warrant I am applying for would permit the examination of the devices recovered from BURRIS's person. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

33.     Manner of execution: Because this warrant also seeks permission to further examine devices that will already in law enforcement's possession, the execution of the search of the cellular device does not involve the further physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of this portion of the warrant at any time in the day or night.

34.     I know from my training and experience, as well as publicly available materials, that encryption systems for mobile phones and other electronic devices are becoming ever more widespread. Such encryption systems protect the contents of these devices from unauthorized access by users and render these contents unreadable to anyone who does not have the device's password. As device encryption becomes more commonplace, the encryption systems implemented by device manufacturers are becoming more robust, with few—if any—workarounds available to law enforcement investigators.

35.     I also know that many electronic devices, particularly newer mobile devices and laptops, offer their users the ability to unlock the device through biometric features in lieu of a numeric or alphanumeric passcode or password. These biometric features include fingerprint 19 scanners, facial recognition features, and iris recognition features.

Some devices offer a combination of these biometric features, and the user of such devices can select which features they would like to utilize. Therefore, I request that this warrant permit law enforcement agents to obtain from BURRIS the compelled display of any physical biometric characteristics (such as fingerprint/thumbprint or facial characteristics) necessary to unlock any device(s) requiring such biometric access subject to seizure pursuant to this warrant for which law enforcement has reasonable suspicion that BURRIS' physical biometric characteristics will unlock the device(s).

36.     If a device is equipped with a fingerprint scanner, a user may enable the ability to unlock the device through his or her fingerprints. For example, Apple offers a feature called "Touch ID," which allows a user to register up to five fingerprints that can unlock a device. Once a fingerprint is registered, a user can unlock the device by pressing the relevant finger to the device's Touch ID sensor, which is found in the round button (often referred to as the "home" button) located at the bottom center of the front of the device. The fingerprint sensors found on devices produced by other manufacturers have different names but operate similarly to Touch ID.

37.     If a device is equipped with a facial-recognition feature, a user may enable the ability to unlock the device through his or her face. For example, this feature is available on certain Android devices and is called "Trusted Face." During the Trusted Face registration process, the user holds the device in front of his or her face. The device's front-facing camera then analyzes and records data based on the user's facial characteristics. The device can then be unlocked if the frontfacing camera detects a face with characteristics that match those of the registered face. Facial 20 recognition features

found on devices produced by other manufacturers (such as Apple's "Face ID") have different names but operate similarly to Trusted Face.

38.     If a device is equipped with an iris-recognition feature, a user may enable the ability to unlock the device with his or her irises. For example, on certain Microsoft devices, this feature is called "Windows Hello." During the Windows Hello registration, a user registers his or her irises by holding the device in front of his or her face. The device then directs an infrared light toward the user's face and activates an infrared-sensitive camera to record data based on patterns within the user's irises. The device can then be unlocked if the infrared-sensitive camera detects the registered irises. Iris-recognition features found on devices produced by other manufacturers have different names but operate similarly to Windows Hello.

39.     In my training and experience, users of electronic devices often enable the aforementioned biometric features because they are considered to be a more convenient way to unlock a device than by entering a numeric or alphanumeric passcode or password. Moreover, in some instances, biometric features are considered to be a more secure way to protect a device's contents. This is particularly true when the users of a device are engaged in criminal activities and thus have a heightened concern about securing the contents of a device.

40.     As discussed in this Affidavit, your Affiant has reason to believe that one or more digital devices are subject to search and seizure pursuant to the applied-for warrant. The passcode or password that would unlock such device(s) subject to search under this warrant currently is not known to law enforcement. Thus, law enforcement

personnel may not otherwise be able to access the data contained within the device(s), making the use of biometric features necessary to the execution of the search authorized by this warrant.

41.     I know from my training and experience, as well as from information found in publicly available materials including those published by device manufacturers, that biometric features will not unlock a device in some circumstances even if such features are enabled. This can occur when a device has been restarted, inactive, or has not been unlocked for a certain period. For example, certain Apple devices cannot be unlocked using Touch ID when: (1) more than 48 hours has elapsed since the device was last unlocked; or, (2) when the device has not been unlocked using a fingerprint for 8 hours and the passcode or password has not been entered in the last 6 days. Similarly, certain Android devices cannot be unlocked with Trusted Face if the device has remained inactive for four hours. Biometric features from other brands carry similar restrictions. Thus, in the event law enforcement personnel encounter a locked device equipped with biometric features, the opportunity to unlock the device through a biometric feature may exist for only a short time. Due to the foregoing, if law enforcement personnel encounter any device(s) that are subject to seizure pursuant to this warrant and may be unlocked using one of the aforementioned biometric features, the warrant I am applying for would permit law enforcement personnel to obtain from BURRIS the display of any physical biometric characteristics (such as fingerprint/thumbprint or facial characteristics) necessary to unlock any device(s), including to (1) press or swipe the fingers (including thumbs) of the aforementioned person to the fingerprint scanner of the device(s); (2) hold

the device(s) in front of the face of the aforementioned person to activate the facial recognition feature; and/or (3) hold the device(s) in front of the face of the 22 aforementioned person to activate the iris recognition feature, for the purpose of attempting to unlock the device(s) in order to search the contents as authorized by this warrant.

## ATTACHMENT A

## To Be Searched

A. The person of Takia A. BURRIS ("BURRIS"), DOB 12/4/1989; and,

B. Any electronic devices found on BURRIS's person, including but not limited to the cellular device assigned call number 414-324-9850 ("the TARGET DEVICES").

**ATTACHMENT B**

1. All records from the TARGET DEVICES as described in Attachment A that relate to violations of 21 U.S.C. § 846 (conspiracy to distribute, and possess with the intent to distribute, controlled substances); 21 U.S.C. § 843(b) (use of a telephone to facilitate drug trafficking); 21 U.S.C. § 841 (possession of controlled substances with intent to distribute); and 18 U.S.C. § 922(o) (possession of a machine gun) (collectively, "the TARGET OFFENSES"), including but not limited to the following:

  a. Any communications regarding controlled substances or firearms;

  b. Location information of BURRIS and any co-conspirators and any information regarding BURRIS' schedule, pattern of movement or travel;

  c. Any payment information including bank transfers, Cashapp transfers, text messages, social media messages, audio/video messages or photographs of bank records, or other financial records;

  d. Any images, including videos, of illegal narcotics or firearms;

  e. Records of Internet Protocol addresses used; records of Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user typed web addresses.

  f. Evidence of user attribution showing who used or owned the TARGET DEVICES at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history.

 During the execution of the searches described in Attachment A, law enforcement personnel are authorized (1) to press the fingers (including thumbs) of BURRIS (2) to present the face of BURRIS to the facial recognition sensor, such as a camera, ("Face ID"),

for the purpose of attempting to unlock the TARGET DEVICES in order to search the contents as authorized by this warrant.

This warrant authorizes a review of electronic storage media and electronically stored information seized or copied pursuant to this warrant, in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the FBI may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.